IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>CRAIG ALAN HAGGER,<br><br>　　　　Defendant. | CR 08-1201-TUC-RCC (GEE)<br><br>**REPORT AND RECOMMENDATION** |

The District Court referred this case to the magistrate for hearing on pretrial matters. Hearing on the defendant's Motion to Suppress was held on November 18, 2009. Upon consideration of the evidence presented and the arguments of respective counsel, the magistrate recommends the District Court, after its de novo review, deny the Motion to Suppress.

## CHARGE:

The one-count indictment charges that on August 30, 2008, the defendant possessed approximately 99.15 kilograms of marijuana with the intent to distribute.

## PROCEDURAL BACKGROUND:

The defendant was arrested on August 30, 2008, and present counsel was appointed to represent him on September 4, 2008. The indictment was filed on September 24, 2008,

Thereafter, six (6) motions to continue the trial date were filed, only one of which was filed by the government. The sixth motion was filed on September 10, 2009, wherein defense counsel stated, among other reasons, the need to "effectively prepare for trial, including the need to complete our investigation and research pretrial motions." On September 16, 2009, the District Court held a hearing on this motion for continuance; the motion was granted and the Court set December 1, 2009, as a "firm" trial date. At that hearing defense counsel stated his intent to file a motion to suppress which would need to be heard prior to trial. Defense counsel filed a motion to suppress on November 2, 2009, over six weeks after the September 16th hearing and less than a month prior to trial. The government timely filed its response to the suppression motion on November 12th and on November 13th hearing on the suppression motion was set for November 18th.

It should be noted that parties are generally allowed 10 days to file objections to the magistrate's Report and Recommendation; however, in this case even if the magistrate completed its Report and Recommendation on the same date as the hearing, the 10 days would not expire until December 2nd–the day *after* the trial is set to begin. The magistrate raised the timing issue with the District Court and was advised to tell the parties to be prepared to argue any objections the morning of trial.

**MOTION TO SUPPRESS:**

Defendant argues for the "suppression of evidence, and fruits of that evidence obtained as a result of an unlawful stop, unlawful arrest, and/or unlawful search." In the course of his "Legal Analysis" portion of the motion, defense counsel asserts that "the reasons put forward for stopping the car did not rise to the level of reasonable suspicion."

***Testimony of Ralph Salcido***

Salcido has been employed a Border Patrol agent for three years. On August 8, 2008, he was on patrol duty in a marked vehicle on in the area north of Sonoita, AZ. At about 10:30 a.m. he received notification of a sensor activation which had occurred approximately a mile

north of the U.S./Mexico border. He and BPA Corbett (in another marked vehicle) were about 10-15 miles north of the sensor alert and proceeded south on Forest Service Road (FSR) 49 toward the location of the alert. Salcido testified the area is rural in nature, and known to be used for narcotics and alien smuggling. He stated that from his training he knew the alert was from a magnetic sensor which is activated by a vehicle, rather than by foot traffic. At some point he and Corbett stopped their vehicles alongside FSR 49 to wait for a vehicle to approach them from the south. After about 10-15 minutes they decided to proceed further southbound to check on the sensor and what had caused its activation. FSR 49 is a narrow, dirt road, just wide enough for two vehicles going in opposite directions to pass each other.

After driving one or two minutes they encountered a white Chevy van with one occupant, the defendant. Salcido testified that because FSR 49 is so narrow, with lots of curves, it is customary for drivers to acknowledge agents as they pass going in opposite directions. However, the defendant did not acknowledge Salcido or Corbett. As the van passed, Salcido pulled to the side of the road and used his side view mirror to read the van's license plate. Salcido testified the configuration and sequence of letters and numbers were not "consistent" with the model year of the van. Salcido explained the van was a 1983 model, but the license plate was of more recent issue. He testified recent intelligence reports have alerted Border Patrol agents that drug smugglers are purchasing older vehicles, and registering them under fictitious names and getting newer license plates for them.

Salcido also testified the Chevy van was traveling at a "very, very high rate of speed." Although there was no posted speed limit, Salcido believed the speed was excessive given the fact that the road was narrow and many of the curves were blind turns. Corbett drove up alongside Salcido, and they decided to turn around and try to catch up with the van while their dispatcher ran a check of the license plates. Salcido testified that traveling at 40-45 mph it took him about two minutes to catch up to the van. Corbett drove his vehicle behind Salcido. The dispatch notified Salcido the van was registered to Jose Juan Cuevas, out of

Nogales AZ. Salcido asked the dispatch to run the customer identification number which provides biographical data on the person to whom a vehicle is registered. The dispatch advised there was no further information listed. Salcido stated this caught his attention because intelligence reports have indicated narcotic smugglers are now doing this because they do not know who will be driving the load vehicles and they do not want to list any biographical data that could be used to identify the drivers.

At the point where FSR 49 intersects with Harshaw Road, which is a paved, the van proceeded north on Harshaw Road. As he followed the van, Salcido noticed the driver "was using his brakes a great deal", and swerved twice into the lane of oncoming traffic. Salcido testified this was significant to him as it suggested the defendant was more concerned with being followed by law enforcement than paying attention to the road in front of him At this point Salcido executed a stop of the van. The defendant stopped immediately.

On cross-examination Salcido testified that if one proceeds south on FSR 49 one runs into the town of Loquil which is right on the U.S./Mexico border. No one presently lives in Loquil; there are just a few ranches in the area. Salcido stated the only other roads leading from the location of the sensor activated that morning would take you further south; if you proceeded south on FSR 49 into Loquil there are roads which would lead you to Nogales, AZ. Salcido admitted the sensor activation does not indicate the direction traveled by the activating source. He stated that after encountering the van, he had to travel further south about 100-200 feet before he came to a place to turn around so as to follow the van. He stated the town of Patagonia is located north on Harshaw Road, about 10 minutes from where FSR 49 intersects with Harshaw Road.

Salcido stopped the van at about 11 a.m. He then questioned the defendant briefly–about five minutes–to determine "where he was headed to, stuff of that nature, just to see how everything was going." Having received the defendant's license, registration, and insurance papers, Salcido ran his name through the dispatcher for any "wants and warrants" with negative results. Salcido noticed the title was registered to one Jose Juan Cuevas, but had

not been signed over to the defendant. Hagger advised Salcido he had just purchased the van before the agents stopped him. Hagger stated he did not know who Jose Juan Cuevas was. Asked about the van purchase, Hagger gave conflicting information: he stated he had purchased the van in Nogales, but couldn't say if it was from a car lot or from an individual; then he said he got it from a friend of a friend, and that he was just "test driving the vehicle from Nogales to Tucson." Hagger denied the presence of any narcotics, and agreed to Salcido's request to search the van. BPA Corbett entered the van and conducted a search while Salcido and Hagger stood outside. Then Salcido stuck his head inside to take a look around. Salcido testified Corbett's search lasted less than five minutes, and that his own search was "brief." Neither of them saw anything, and Salcido called for canine assistance. Salcido testified the canine unit arrived 15 minutes later and the dog alerted to the presence of narcotics within five minutes of its arrival. The defendant was thereafter arrested.

## DISCUSSION:

### *Reasonable suspicion for the stop*

In determining whether reasonable suspicion existed to justify an investigatory stop, a reviewing court is required to "look at the totality of the circumstances of each case to see whether the detaining officer ha[d] a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273 (2002). "In the context of Border Patrol [stops], the factors to be considered in determining whether 'reasonable suspicion' exists to justify stopping a vehicle include, but are not limited to: (1)characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver...; (6) appearance and behavior of passengers; (7) model and appearance of the vehicle; and (8) officer experience." *United States v. Garcia-Barron,* 116 F.3d 1305,1307 (9th Cir. 1997) (citing *United States v. Brignoni-Ponce,* 422 U.S. 873, 885 (1975).

In the present case Salcido listed the following factors for support of his decision to conduct an investigatory stop of the defendant: (1) encountering the defendant's vehicle shortly after a sensor activation occurring approximately one mile north of the border; (2) the area is rural and known for smuggling activities; (3) the defendant's failure to acknowledge either of the agents as he passed them on a narrow, dirt road which behavior was unusual in the agent's experience; (4) the defendant traveling at an unsafe speed on the narrow, dirt road; (5) recent plates on the defendant's older vehicle and lack of biographical data available on the registered owner of the vehicle as both of these facts related to intelligence reports received regarding smugglers; and (6) the defendant's erratic driving, i.e., frequent braking and swerving, which Salcido believed indicated the defendant was concerned about the presence of law enforcement.

In deciding whether the totality of the circumstances constitute a reasonable suspicion, it is inappropriate to view each factor in isolation and to give no weight to factors for which an innocent explanation may exist. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Individual factors that may appear innocent in isolation may constitute suspicious behavior when aggregated together. While no particular factor is controlling and the totality of the circumstances governs, the one vital element is that the agent must have had reason to believe the suspect vehicle had come from the border.

Considering the factors listed by Salcido and analyzing them in the context of the "totality of the circumstances", this court concludes Salcido had reasonable suspicion to conduct an investigative stop of the vehicle the defendant was driving.

### *Search of the van/ length of investigatory stop*

It should be noted that the government objected to the defense questioning Salcido regarding the search of the van on the basis it was beyond the scope of the defendant's challenge of the vehicle stop. Defense counsel argued his questioning was relevant "because the stop itself is not complete at the time of pulling the car over. The contraband is not found [until] after canine units arrived. So whether the stop was justified initially is one question.

And whether the continued detention of Mr. Hagger was justified is another question, because I think reasonable suspicion needs to become probable cause to continue the length of detention." This court commented that the written motion contained no specific reference to the length of the detention and no case law was cited relating to that issue. The defense motion very generally challenges "an unlawful stop, unlawful arrest, and/or unlawful search." Arguably, this language and the "Legal Analysis" section of the defense motion would not have given the government sufficient notice that the length of the detention was also being challenged. As noted above, the defendant's motion cited no cases discussing the length of the detention and, at the hearing, defense counsel was unable to cite any cases. However, this court overruled the government's objection, allowed defense to continue with this line of questioning, and ordered that each side would have until 5 p.m. the following day to file a memorandum addressing the length of detention issue.

The defendant argues that because there was no reasonable suspicion to justify the investigatory stop, the defendants's consent to the search was a "fruit of the poisonous tree" and therefore not valid. He relies on *United States v. Twilley,* 222 F.3d 1092 (9th Cir. 2000). However, as indicated above, the magistrate has concluded there was reasonable suspicion to justify the stop in this case, and that fact sufficiently distinguishes this case from *Twilley* wherein the Court apparently found consent to search a vehicle was not sufficient to attenuate the taint of the stop which the Court found to be invalid. *Id.* at 1097.

The defendant argues, alternatively, that even if the stop was valid, the delay in the investigation until the arrival of the canine unit was unreasonable.

Neither party presented evidence as to exactly how much time elapsed between the time the van was stopped and the time the narcotics were found. Salcido estimated the stop occurred at about 11 a.m. Reviewing the testimony, it appears that after the stop Salcido questioned the defendant for about five minutes about the van's ownership, ran a "wants and warrants" check through his dispatcher, asked for and obtained the defendant's consent to search the vehicle. The actual search by the agents on the scene seems to have been

completed in about five minutes. The canine unit arrived at the scene about 15 minutes later and alerted within five minutes of its arrival.

In *United States v. Sharpe*, 470 U.S. 675 (1985), the U.S. Supreme Court considered the question of whether a 20 minute detention is too long to be justified as an investigative stop *Id.* at 676-677. In *Sharpe* a DEA agent had observed to a truck and car being driven in tandem by Savage and Sharpe, respectively, and suspected they were involved in drug trafficking. The agent enlisted the help of a highway patrol officer in executing an investigatory stop of the vehicles. The DEA agent stopped the car driven by Sharpe without incident and after securing Sharpe, the agent went to assist the highway patrol officer in his pursuit of the truck driven by Savage. The highway patrol officer managed to stop Savage and review his driver's license and registration. However, when Savage then asked to leave, the officer advised he was not free to leave but would have to await the arrival of the DEA agent who arrived about 15 minutes later. Savage declined to consent to the agent's request to search the truck. The agent then stood on the rear of the truck and confirmed it was overloaded and, having placed his nose near the rear window, detected the smell of marijuana. The agent then opened the vehicle and arrested Savage after observing bundles of marijuana. Savage was then arrested about 20 minutes after being stopped by the highway officer. The Fourth Circuit Court of Appeals had found that there while there was articulable and reasonable suspicion to believe Savage was engaged in criminal activity, the investigatory stop was unlawful because it "failed to meet the requirement of brevity thought to govern detentions on less than probable cause." *Id.* at 680. The Supreme Court noted: "The only issue in this case, then, is whether it was reasonable under the circumstances facing [the DEA agent and highway patrol officer] to detain Savage, whose vehicle contained the challenged evidence, for approximately 20 minutes." *Id.* The Court observed that its cases imposed no rigid time limitation on *Terry* stops; and that while it is clear that the brevity of the invasion of an individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable

suspicion, "we have emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.* at 685 (citations omitted). In concluding that the 20 minute detention of Savage "clearly" met the Fourth Amendment's standard of reasonableness, the Court wrote: "In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* 686 (citations omitted).

As in *Sharpe*, in the present case there was no evidence presented suggesting the agents were dilatory in their investigation or that there was any delay unnecessary to the legitimate investigation of the agents. In *Florida v. Royer,* 460 U.S. 491 (1983), the Court found the 90 minute detention of the defendant in an airport while his luggage was taken to detection dog for a "sniff test" was an unreasonable investigatory stop. In *Sharpe* the Court noted that the rationale for *Royer* was premised on the fact that the police knew of the suspect's arrival time for several hours beforehand and could have arranged for a trained narcotics dog in advance and avoided the 90 delay. *Sharpe* at 685. In the present case the narcotics dog was brought to the scene of the stop. There was no evidence the agents had previous knowledge that Hagger would be transporting marijuana at 10:30 that morning; nor was there any evidence there was unnecessary delay in bringing the dog to the scene. It should also be noted there was no evidence that Hagger at any time protested or withdrew his consent to search the van.

In view of the above this court finds the search of the van was a valid part of the investigatory stop.

### RECOMMENDATION:

In view of the foregoing, the magistrate recommends that the District Court, after its independent review of the record, **DENY** the Motion to Suppress. As noted above, trial in

| | |
|---|---|
| 1 | this matter is scheduled for December 1, 2009; therefore, the parties will not have the usual |
| 2 | 10 days to file objections to this Report and Recommendation. Counsel should be prepared |
| 3 | to argue any objections to this Report and Recommendation the morning of trial. |
| 4 | This Report and Recommendation is being faxed to all counsel on today's date. The Clerk |
| 5 | of the Court is directed to send a copy of this Report and Recommendation to all counsel. |
| 6 | DATED this 30th day of November, 2009. |

Glenda E. Edmonds
United States Magistrate Judge